

U.S. DISTRICT COURT
EASTERN DISTRICT OF LA
2005 OCT 13  PM 1: 31
LORETTA G. WHYTE
CLERK

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| JOHN FONTENOT | CIVIL ACTION |
| VERSUS | NO. 03-2821 |
| McCALL'S BOAT RENTALS, INC. ET AL. | SECTION "I" (2) |

## <u>FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>

Plaintiff, John Fontenot ("Fontenot"), filed this action for damages against defendants, McCall's Boat Rentals, Inc. and SEACOR Marine, LLC (formerly SEACOR Marine, Inc.). In his original complaint against McCall's only, plaintiff invoked only the general maritime law and its jurisdictional statute, 28 U.S.C. § 1333, and alleged that the vessel was unseaworthy and that defendant was negligent.  Complaint, Record Doc. No. 1. In his amended complaint, plaintiff added SEACOR as a defendant and again alleged that the vessel was unseaworthy and that defendants were negligent. Amended Complaint, Record Doc. No. 40. However, in the final pretrial order, which supersedes the pleadings, the parties stipulated that jurisdiction arose under the Longshore and

Fee_____
Process_____
X Dktd_____
CtRmDep_____
Doc. No._____

Harbor Workers' Compensation Act ("LHWCA"), 33 U.S.C. § 905(b); the Outer Continental Shelf Lands Act ("OCSLA"), id. § 905(c); 43 U.S.C. § 1333; and the court's admiralty jurisdiction.  Pretrial Order, Record Doc. No. 47.  Fontenot alleged that he suffered injuries while on board defendants' vessel that were caused by defendants' fault.

Trial was conducted before the undersigned magistrate judge without a jury on July 14-15, 2005, pursuant to the written consent of all parties, Record Doc. No. 14, and 28 U.S.C. § 636(c).  Having considered the complaint, the evidence, the record, the applicable law, and the written submissions and oral argument of counsel, I enter the following findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52(a).

## FINDINGS OF FACT

1.    The following uncontested material facts were stipulated in the pretrial order, Record Doc. No. 47, ¶ E at p. 6, and I adopt them as factual findings.

(a)    Plaintiff was an employee of Nabors Offshore Corporation at the time of the incident in dispute and was on the vessel, M/V DEANNE McCALL, which was owned and operated by defendants, on August 26, 2002.

(b)    Plaintiff was employed by Nabors as a roustabout and was working on a Chevron U.S.A. platform.

2

(c)    Plaintiff and the lead roustabout, his brother, Prosper Fontenot ("Prosper"), were aboard defendants' M/V DEANNE McCALL doing rigging work in connection with backloading of cargo from the platform to the vessel.

(d)    Backloading of the M/V DEANNE McCALL was being performed by Nabors personnel, including the Nabors crane operator, Robert Willingham, and the Nabors roustabouts, Prosper and John Fontenot.

2.    I find that the testimony of the Nabors crane operator, Robert Willingham; defendants' former deckhand, Randall Smith; and defendants' former vessel captain, Kevin Primeaux, was credible.  Smith and Capt. Primeaux, as former employees of defendants, were disinterested witnesses.  The demeanor, bearing, professionalism, obvious sincerity and straightforward manner of testifying of these three witnesses, together with the internal consistency of their testimony, inspired confidence in the trustworthiness of their descriptions of the material events.  The credible evidence established the following facts.

3.    On August 26, 2002, Prosper and John Fontenot were working as roustabouts under the supervision of Willingham, who was operating the crane on the platform.  Prosper and John Fontenot were certified riggers and experienced oilfield roustabouts.

3

4.     The three Nabors employees were transferring cargo from the platform to the M/V DEANNE McCALL.  Prosper and John Fontenot were on the vessel and were placing and securing the cargo items on the deck of the vessel after the crane operator lowered them.  The weather was good and the seas were only two to four feet.

5.     Toward the end of the backloading operation, three large, full, heavy, nylon, reusable trash bags were lowered onto the deck and stacked on top of each other against the port side of the boat.  Although all of the Nabors witnesses testified that the trash bags should have been loaded last, the crane operator lowered one more cutting box after the trash bags had been placed.  As the last cutting box was lowered, it caught the top trash bag and toppled it over onto the deck.  The toppled trash bag blocked what had formerly been a clear pathway from the midships area of the deck to the stern along the port side of the boat.

6.     Prosper and John Fontenot tried to move the trash bag out of the former pathway, but they were unable to lift it.  They then bound the cargo with chains.  The trash bag was in that position for perhaps as much as 15 to 20 minutes before the Fontenots finished binding down the last cutting box.

7.     The captain of the M/V DEANNE McCALL routinely prepared a Job Safety Analysis ("JSA") on a form provided by SEACOR for each loading operation.

Plaintiff's Exh. 26, blank JSA form. The purpose of the JSA was to identify the steps necessary to complete an operation, identify any safety hazards and decide what actions should be taken to minimize such hazards.

8.    When the Nabors roustabouts arrived on the vessel, they were required to sign the JSA, which the M/V DEANNE McCALL's first shift captain, Captain Larry Fort, had prepared. The backloading began shortly after 11:00 a.m. and lasted about three hours. Capt. Primeaux and Smith signed the JSA when they began their shifts at noon. Despite SEACOR's practice of keeping all original JSA's on the vessel, the signed JSA for this backloading operation was never found. However, the testimony was undisputed that two of the items on the JSA were to keep a clear walkway and to maintain good communication with all participants.

9.    Willingham and Prosper each had two-way radios, so that they could communicate with each other and with the vessel captain. It was the lead roustabout's responsibility to keep a working radio with him and keep it turned on.

10.    Prosper testified that his radio went dead toward the end of the backloading. He testified that, because his radio was not working, he asked Smith to go to the wheelhouse and ask the captain to radio Willingham and ask Willingham to use the crane to move the trash bag to clear a walkway. Prosper stated that, as Smith began moving

5

toward the wheelhouse, Prosper and his brother tried but failed to move the trash bag. For the reasons set out below, this testimony by Prosper Fontenot is not credible.

11.    The testimony of plaintiff's brother, Prosper, concerning the dead radio was too convenient, conflicted with Willingham's credible testimony and was not believable. Prosper's interest in furthering his brother's case also weighs against its credibility. There was no testimony that either Prosper or Willingham had complained at any time before this that the radio was not working.  There was no testimony that Prosper or Fontenot needed to use hand signals to communicate with the crane operator at any time before this.  The roustabouts could have used hand signals to communicate with the crane operator if the radio had been dead.  Furthermore, Prosper testified on cross-examination that he asked Smith to speak to the captain and that Smith was walking towards the wheelhouse before Prosper and plaintiff tried to move the bag.  If the roustabouts had been able to move the bag and clear the walkway, it would have been unnecessary for Smith to go to the wheelhouse to ask the captain to contact Willingham. It is not credible that Prosper asked Smith to contact the captain and that Smith was already moving in that direction before the Fontenots had tried to move the bag.

12.    Willingham credibly testified that he spoke with Prosper on the radio several times during the backloading and that the radio was working during the entire

6

operation.  The crane operator said that he called Prosper to notify him that one more

cutting box was coming down to the deck of the vessel after the trash bags had been

lowered, and Prosper told him where to place the cutting box.  Later, Willingham saw

plaintiff fall while the crane operator was swinging the personnel basket over the boat

and looking down to see where to land it.  He said that plaintiff was looking up at the

basket and tripped as he walked.  Willingham specifically remembered calling Prosper

on the radio to find out if Fontenot was hurt.  He testified that Prosper answered the radio

each time that he called, including after plaintiff's accident, which directly contradicts

Prosper's untrustworthy testimony that the radio had stopped working before his brother

fell.

     13.    Although Prosper's testimony that he asked the deckhand Smith to go to the

wheelhouse to talk to the captain about moving the trash bag was uncontradicted, that

fact does not render the testimony credible.  Prosper's testimony was <u>not</u> corroborated

by either Smith or Capt. Primeaux.  Smith did <u>not</u> testify that Prosper asked him to go

to the wheelhouse and ask the captain to contact Willingham.  Oddly, Smith was not

even asked at trial whether Prosper had made this alleged request.

     14.    Similarly, Capt. Primeaux did <u>not</u> testify that Smith came to the wheelhouse

with Prosper's alleged request.  Again, Capt. Primeaux was not specifically asked at trial

whether this event occurred.  However, Capt. Primeaux testified that no one from Nabors ever asked him to move the trash bag and that Smith did not notify him that the walkway had been blocked.   He stated that, if Smith had notified him that the walkway was obstructed, he would have ordered it cleared to eliminate a safety hazard. As previously noted, I find that Capt. Primeaux and Smith were credible and their testimony was trustworthy, while Prosper's testimony was not credible.

15.    After all of the cargo had been placed on the deck (see Plaintiff's Exh. 18, photograph of the back deck with cargo taken after the vessel arrived at the dock), Capt. Primeaux announced over the public address system on the vessel, which the roustabouts heard, that "everything looks okay, bind it down." This generic announcement after all the cargo had been loaded does not corroborate Prosper's allegation that Smith had told the captain that the trash bag was blocking access to the stern, nor does it establish that the captain knew that the trash bag was blocking access to the stern but was not willing to have it moved.

16.    While plaintiff secured the last cutting box amidships, Smith and Prosper proceeded to the stern.  Because there was no clear walkway on the port side, Smith walked from the midships area to the stern on top of a "gun rack," which had been loaded along the starboard side of the deck.  The gun rack was 3 to 4 feet wide and contained

8

several 20-foot lengths of pipe, known as "guns."  The guns had been used to perforate the well casing by using gunpowder to shoot "bullets" through the walls of the guns and into the casing.

17.   The gun rack was positioned on the deck so that the length of the pipes ran parallel to the starboard side of the boat.  The gun rack was not full and there were gaps between the pipes.  See Plaintiff's Exh. 18, photograph of back deck loaded with the cargo on the day of the accident; Plaintiff's Exh. 21, photograph of a similar gun rack.

18.   Smith went to the stern first by walking along the top of the pipes in the gun rack, which he accomplished without incident.  When he reached the stern safely, he assisted with landing the personnel basket that Willingham was lowering.  Prosper went next, holding onto the starboard rail as he walked along the top of the gun rack from amidships, which he also accomplished without incident.  He reached the stern safely, where he also held on to the personnel basket.

19.   Finally, plaintiff walked along the gun rack while holding onto the starboard rail, following the same route that both his brother and Smith had just safely traversed, but his foot slipped into a gap between the pipes.  His boot was caught by a strap around the pipes and he fell.  Plaintiff twisted as he fell, sustaining injuries, but he

was able to get up without assistance. As the Fontenots were lifted off in the personnel basket, Smith walked back over the gun rack and went inside the boat cabin.

20.     Neither Smith, Prosper, plaintiff nor Willingham thought at the time that it was too dangerous to walk on top of the gun rack. All of them had authority to stop the work if they perceived that conditions were too dangerous to continue, but none of them did so.

21.     During backloading, Capt. Primeaux was at the stern controls of the M/V DEANNE McCALL, briefly maneuvering the boat to keep it in position under the crane and off the platform because the seas were pushing it toward the platform. The only instructions that Capt. Primeaux gave the Nabors personnel about the backloading operation were general instructions to load the tallest and heaviest items of cargo towards the forward end of the deck and to keep the cargo balanced.

22.     The blanket time charter between Chevron, the platform owner, and SEACOR provides that the captain remains in charge of the operations and safety of the vessel at all times. Plaintiff's Exh. 25, blanket time charter. However, Nabors was not a party to that contract. The Chevron/SEACOR contract is not the source of defendants' duty, if any, to Nabors personnel while they are on board defendants' vessel.

10

23.     Pursuant to SEACOR's policy manual, Plaintiff's Exhs. 32-34, and the custom in the industry, about which both Capt. Primeaux and Smith credibly testified, the vessel captain has overriding authority at all times over all aspects of <u>vessel</u> operations and over the safety of all persons on board.  This policy concerning <u>vessel</u> operations does not translate to a duty on the part of the captain to direct the work of certified riggers who are loading and securing cargo from the platform onto the vessel.

24.     The Nabors crane operator, not the boat captain, was in charge of the backloading operation.  None of the Nabors personnel was under the active supervision or control of Capt. Primeaux during backloading.  Willingham was at all times in charge of the backloading operation and the Nabors roustabouts were at all times under his direct control and supervision.

25.     Capt. Primeaux did not see Smith or the roustabouts walk on top of the gun rack and did not see plaintiff fall because he was prudently busy maneuvering the boat, keeping it under the crane and off the platform, and watching the cable as Willingham lowered the personnel basket.  After the basket landed, Capt. Primeaux saw plaintiff getting up from the deck, shaking his hand and looking at it as he rose, as if his hand were hurt.

11

26.     Capt. Primeaux candidly testified that the JSA's requirement to keep a clear walkway was his responsibility and that it had been violated.  However, the credible evidence, including Smith's testimony, Capt. Primeaux's testimony and an e-mail message that the captain sent that evening, establishes that Capt. Primeaux did not know before Fontenot fell that the port side walkway had been blocked by the trash bag.  Capt. Primeaux sent an e-mail message that evening, explaining his sketchy understanding of the incident, after Chevron notified him that Fontenot was claiming an injury from his fall earlier that day.  Capt. Primeaux stated in the e-mail that the last cutting box had blocked the only path to the stern and that he would have taken action to move the box if he had known that it blocked the path.  However, he stated that he did not know about it because the taller cargo items blocked his view and he could not see that part of the deck from his position in the wheelhouse.  Defendant's Exh. 7, e-mail message dated August 26, 2002 at 8:06 p.m.  This e-mail confirms that Capt. Primeaux was unaware, before and even after the accident, that a trash bag, not a cutting box, had blocked the path.

27.     Thus, even though Capt. Primeaux testified that he would have stopped Smith and the Fontenots from walking on the gun rack if he had known that they were

doing so, he did not know about the fallen trash bag or the men walking on the gun rack until after Fontenot's accident.

28.   The testimony for plaintiff was not credible.  For example, I cannot credit the testimony of plaintiff himself because of its overwhelming unreliability.  My observations and findings concerning plaintiff's testimony on the stand are that Fontenot is a person of limited cognitive ability and restricted powers of observation and recollection.  He could not recall, had trouble understanding or did not know basic information, including what binge drinking is, why his doctors characterized him as a binge drinker, what a social security disability benefits claim is and why he had filed one in connection with injuries he suffered in a prior accident in 1992.  He testified that he had been married since 1999.  However, his girlfriend, Tori Ardoin, testified that she and plaintiff were not married, and Fontenot told psychiatrist, Rennie W. Culver, M.D., Ph.D., in October 2004 that he was engaged but not married.  Defendant's Exh. 50.

29.   In addition, I cannot credit plaintiff's testimony because on the stand Fontenot appeared malleable and compliant to the wishes or suggestions of others, and his demeanor, bearing and manner of testifying at trial did not inspire confidence in his ability accurately to recollect events.  There were numerous inconsistencies between his trial and his deposition testimony.  For example, plaintiff testified in his deposition that

13

there were four trash bags and that all of them had fallen into the walkway. He also said they had fallen because the boat had shifted, not because the last cutting box had knocked them over. At trial, he testified that the cutting box had caught and toppled the single trash bag. Plaintiff testified at his deposition that he had spent the entire early morning of August 26, 2002 washing the platform and that he had done nothing else before backloading the M/V DEANNE McCALL. At trial, he said that he had helped Prosper and two other roustabouts offload another work boat in the early morning. Fontenot testified at trial that Capt. Primeaux was supervising his work, but he stated in his deposition and at other times during his trial testimony that none of the vessel crew told him what to do or supervised his work. He admitted that certain aspects of his testimony became clear to him only after he had reviewed photographs of the vessel and its cargo before trial. It appeared that plaintiff had recently learned, rather than recalled, much of his trial testimony.

30.    Furthermore, Fontenot suffered lower back and right leg injuries in 1992, which prevented him from working for almost two years. During that period, he was treated repeatedly by several doctors, he made a claim for worker's compensation, which was settled for a lump sum of $8,500, and he applied for social security disability insurance benefits. He did not reveal this history of prior injury, extended treatment and

inability to work to any health care provider who examined or treated him in connection with his accident on the M/V DEANNE McCALL, despite being asked by each health care provider whether he had ever suffered any prior injury. He even testified in his deposition that he had never had any prior back injury or made any claim arising out of any injury. Fontenot's explanation at trial that he had forgotten about his 1992 injuries, the almost two-year period of treatment and inability to work, and making and settling a worker's compensation claim is simply unbelievable, especially for a man who says he defines his self-worth by his ability to work and support his family. Furthermore, his records of treatment by psychologist Dr. Ted Friedberg do not support any complaints of memory loss, Plaintiff's Exh. 8, and psychiatrist Dr. Culver noted that plaintiff's recent and remote memory were intact. Defendant's Exh. 50 at p. 7. For all of the foregoing reasons, plaintiff's testimony cannot be credited.

## CONCLUSIONS OF LAW

1.      This court has jurisdiction over plaintiff's claims asserted under the general maritime law, the LHWCA and the OCSLA. Venue is proper in this district. No state law claims were asserted.

2.      At trial, the court took under advisement the admissibility of Plaintiff's Exh. 36, entitled "Root Cause(s) Summary Report of Analysis." Defendants objected that the

exhibit was inadmissible because it was not authenticated and it was hearsay. Fontenot argued that the document had been authenticated during the corporate deposition of ChevronTexaco Production & Exploration Company. Having read that deposition following the trial, I find that the document was not authenticated by ChevronTexaco's corporate representative because no one asked her to do so. See Plaintiff's Exh. 15, at pp. 9-10. Therefore, defendants' objection to Plaintiff's Exh. 36 is sustained.

3.    In addition, the court makes the following rulings concerning defendants' objections to portions of the deposition testimony offered by plaintiff. Record Doc. No. 49, Defendants' Objections to Deposition Testimony. Defendants' objections to the deposition excerpts of Dr. Louis Blanda and of Dr. Ted Friedberg are overruled. Defendants' objections to the excerpts from Dr. Daniel Hodges's deposition are sustained.

4.    Fontenot has brought claims against the vessel owner and operator under Section 905(b) of the LHWCA. "The LHWCA provides the exclusive remedies for injuries to employees injured while subject to the LHWCA. It creates for such employees an action against the vessel (including its owner) on which the employee was working when injured." Demette v. Falcon Drilling Co., 280 F.3d 492, 497 (5th Cir. 2002).[1] Section 905(c) of the LHWCA and Section 1333(b) of the OCSLA permit

---

[1]The parties agree that plaintiff meets the requirements to bring suit under Section 905(b) of the LHWCA. "To qualify as a longshoreman under the LHWCA, the employee must be engaged in maritime

plaintiff to assert his OCSLA claims under Section 905(b) as well.  33 U.S.C. § 905(c);

43 U.S.C. § 1333(b); Demette, 280 F.3d at 502.

5.     Plaintiff's claims are governed by the United States Supreme Court's

decision in Scindia Steam Navigation Co. v. De Los Santos, 451 U.S. 156 (1981), and

its progeny.

> As owner of the vessel on which Plaintiff was injured, Defendant . . . owes
> three specific legal duties to independent contractors working on the vessel
> under 33 United States Code, section 905(b).  Section 905(b) gives a
> longshoreman worker the right to file a third party suit against a shipowner
> for personal injuries sustained during the cargo operations aboard the
> owner's vessel as a result of the vessel's negligence. In Scindia, . . . , the
> United States Supreme Court defined the vessel owner's duties under
> section 905(b) to include the following:  (1) a turnover duty, meaning that
> the vessel would be liable if the vessel owner fails to turn over a reasonably
> safe ship or fails to warn on turning over the ship of hidden defects of
> which it knew or should have known; (2) an active control duty, meaning
> that the vessel would be liable if the vessel owner fails to remedy hazards
> under the active control of the vessel; and (3) the duty to intervene,
> meaning that the vessel would be liable if the vessel owner fails to
> intervene in the stevedore's operations when it has actual knowledge both
> of the hazard and that the stevedore, in the exercise of obviously
> improvident judgment, means to work on in the face of it and therefore
> cannot be relied on to remedy it.

Pledger v. Phil Guilbeau Offshore, Inc., No. 02-1796, 2003 WL 2012382, at *2 (E.D. La.

May 1, 2003) (Fallon, J.) (citing Scindia, 451 U.S. at 167-69) (emphasis added), aff'd,

No. 03-30514, 2004 WL 249597 (5th Cir. Feb. 10, 2004).  The parties agree that the first

---

employment over navigable water, but not a seaman." Id. at 502 n.45 (citations omitted).

Scindia duty, the "turnover duty," is irrelevant to this matter and that only the second and third of the Scindia duties are at issue in the instant case.

6.    As to the second Scindia duty, which arises out of the vessel's active control over any hazards, it is well established that

> determining placement of the cargo does not constitute active control. Neither does simply maintaining the position of the ship while the stevedore and lift boat personnel perform all other duties in connection with the loading. For the shipowner to be liable under the second Scindia duty[,] the vessel must exercise active control over the actual methods and operative details of the longshoreman's work.

Pledger v. Phil Guilbeau Offshore, Inc., No. 03-30514, 2004 WL 249597, at *1 (5th Cir. Feb. 10, 2004), cert. denied, 125 S. Ct. 47 (2004) (citations omitted) (emphasis added).

7.    Just as in Pledger, "[t]his record reflects no evidence of such control." Id. The only instructions that Capt. Primeaux gave the Nabors personnel were general instructions to load the tallest and heaviest items of cargo towards the forward end of the deck and to keep the cargo balanced.  The crane operator was in charge of the loading operation and he directly supervised the roustabouts.  Capt. Primeaux did not instruct Willingham or the roustabouts where to load or how to bind each item of cargo.

8.    All of the conditions that led to the walkway being obstructed and the roustabouts' decision to walk on top of the gun rack were caused by the Nabors workers themselves, not by any action or inaction of the vessel captain or its crew.  The trash bag

was toppled by Willingham's lowering of and the roustabouts' placing of the cutting box. The trash bag was not moved out of the pathway because of inaction by the roustabouts and the crane operator. Prosper's radio was supplied by Nabors or Chevron, <u>not</u> by the vessel. If the radio was not working, it was the responsibility of the Nabors personnel to obtain one that worked or to use hand signals to communicate with Willingham. Accordingly, Fontenot has failed to prove that defendants were in active control of the loading operation. I conclude that, based on these facts, there was <u>no</u> breach by defendants of the second <u>Scindia</u> duty.

9.    With respect to the third <u>Scindia</u> duty, the duty to intervene in a longshoreman's work,

> the vessel owner can rely on the stevedore's expert knowledge, including the <u>stevedore's judgment that a condition, although dangerous, is safe enough</u> to permit work to continue. The vessel owner has a duty to intervene <u>only when it has actual knowledge</u> that the stevedore is using an unsafe practice which is creating a hazard because the stevedore intends to work in the face of the hazard and cannot be relied on to remedy it. The owner's responsibility is narrow and <u>requires something more than mere shipowner knowledge of a dangerous condition</u>.

<u>Id.</u> (quotation and citations omitted) (emphasis added).

> <u>Scindia</u>, therefore, requires the existence of two basic conditions for the imposition of the shipowner's duty to intervene--the shipowner's actual knowledge of a danger to a longshoreman, and the shipowner's knowledge that the longshoreman's employer is not acting reasonably to protect its employees from that danger. The [Fifth Circuit has] outlined considerations

that pertain to the existence of these basic conditions: [1] whether the danger was open and obvious; [2] whether the danger was located within the ship or ship's gear; [3] which party created the danger or used the defective item and was therefore in a better position to correct it; [4] which party owned and controlled the defective item; [5] whether an affirmative act of negligence or acquiescence in the use of a dangerous item occurred; and [6] whether the shipowner assumed any duty with regard to the dangerous item.

Williams v. M/V SONORA, 985 F.2d 808, 814 (5th Cir. 1993) (quotation and citations omitted).

In the instant case, just as in Pledger,

[p]laintiff's evidence does not create an issue of the Captain's actual knowledge, but only that he should have known of the presence of the [condition]. As the district court also held, however, even if knowledge was established[,] the evidence shows that the stevedore did not consider the [condition] dangerous, or that it created an unreasonable risk of harm to them or their operation. There is no evidence that the shipowner should have thought otherwise.

Pledger, 2004 WL 249597, at *1.

10.     "[A]ctual, not constructive, knowledge is mandated by the Supreme Court's Scindia requisites for liability under § 905(b)." Helaire v. Mobil Oil Co., 709 F.2d 1031, 1038-39, 1040 (5th Cir. 1983).

11.     The credible evidence establishes that Capt. Primeaux did not know before Fontenot's accident that the trash bag had toppled over and was blocking the formerly clear walkway, or that the roustabouts were walking over the gun rack. In the absence

of the captain's actual knowledge of both these conditions, no duty to intervene exists. Pledger, 2004 WL 249597, at *1; Helaire, 709 F.2d at 1038-39, 1040.

12.    Moreover, all three of the men who walked along the top of the gun rack testified that they did not consider it to be an unreasonably dangerous situation, and Willingham agreed.  Thus, even if Capt. Primeaux had known that the walkway was blocked, there is insufficient evidence that he should have thought that the alternative of walking along the gun rack was unreasonably dangerous.

13.    None of the six factors outlined by the Fifth Circuit leads to a conclusion that Capt. Primeaux or any vessel crew member had a duty to intervene in the backloading.  Although the danger of not having an open walkway was arguably open and obvious, Prosper, Fontenot, Willingham and Smith all testified that they did not consider it too dangerous to walk along the gun rack.  The danger was not located within the ship or ship's gear but was created by the Nabors personnel, who were in the better position to correct it. Nabors personnel controlled the placement of the trash bag and the gun rack and were themselves solely responsible for blocking the walkway.  There was no affirmative act of negligence or acquiescence in the use of a dangerous item by the vessel crew, and the shipowner assumed no duty with regard to any dangerous item. For

all of the foregoing reasons, plaintiff has failed to prove that defendants had any duty to intervene.

14.    Fontenot has failed to establish that defendants are liable under Section 905(b) of the LHWCA.

15.    In his pre-trial and post-trial memoranda and at trial, Fontenot argued that his injuries were caused by defendants' negligence and that defendants are liable to him under Section 905(b) of the LHWCA and Scindia, which was decided under that statute. Plaintiff has never argued or put on any proof that the M/V DEANNE McCALL was unseaworthy. Accordingly, plaintiff has failed to bear his burden of proof in this regard, and his claim of unseaworthiness is deemed abandoned. Chapman v. Pacificare of Tex., Inc., No. H-02-2188, 2005 WL 1155108, at *8 (S.D. Tex. Apr. 18, 2005) (Werlein, J.) (citing Scales v. Slater, 181 F.3d 703, 708 n.5 (5th Cir. 1999)); Bergen v. Continental Cas. Co., 368 F. Supp. 2d 567, 571 n.1 (N.D. Tex. 2005) (Sanders, S.J.); Sheridan v. Merck & Co., No. 02-2581, 2003 WL 22902622, at *3 n.2 (E.D. La. Dec. 8, 2003) (McNamara, J.); Bollinger Shipyards Lockport, L.L.C. v. Amclyde Engineered Prods., Inc., No. 01-707, 2003 WL 21396773, at *4 (E.D. La. June 11, 2003) (Berrigan, J.).

## CONCLUSION

To whatever extent, if any, any of the foregoing findings of fact constitute conclusions of law and vice versa, they are adopted as such. Based on the foregoing findings of fact and conclusions of law, **IT IS HEREBY ORDERED** that judgment will be entered in favor of McCall's Boat Rentals, Inc., and SEACOR Marine, LLC (formerly SEACOR Marine, Inc.), and against plaintiff, John Fontenot, dismissing plaintiff's complaint with prejudice, all parties to bear their own costs.

Houma,[2] Louisiana, this _12th_ day of October, 2005.

JOSEPH C. WILKINSON, JR.
UNITED STATES MAGISTRATE JUDGE

---

[2]Although this case was tried in this court's New Orleans courthouse, and I have had full access to the voluminous evidentiary materials submitted at trial there during my preparation of these findings and conclusions, this document and the judgment are being executed by me in Houma, Louisiana, pursuant to this court's temporary emergency procedures adopted in the aftermath of Hurricane Katrina.

23